# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| BECKY GULLION, Parent and as Next Friend of A.M., a Minor, | No. 19-CV-3015-CJW-MAR |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| MANSON NORTHWEST WEBSTER SCHOOL DISTRICT; JUSTIN DAGGETT, in his Individual and Official Capacities; and BRETT LARSON, in his Individual and Official Capacities, | |
| Defendants. | |

---

## TABLE OF CONTENTS

I.  BACKGROUND ................................................................................ 3

    A.  Parties ................................................................................... 3

    B.  Incidents Related to Bullying .................................................... 4

    C.  Investigation, Disciplinary Meeting, and School Transfer .................. 6

    D.  Claims and Procedural History ................................................... 7

II. MOTION TO AMEND COMPLAINT ................................................. 8

    A.  Applicable Law ....................................................................... 8

    B.  Discussion ............................................................................ 10

III.     MOTION FOR SUMMARY JUDGMENT ............................................. 13

     A.     Applicable Law ....................................................................... 13

     B.     Discussion .............................................................................. 15

          1.     Section 1983 Claims .................................................. 15

               a.     Procedural Due Process .......................................... 16

                    i.     Suspension ................................................. 16

                    ii.     Placement ................................................... 18

               b.     Substantive Due Process ........................................ 24

                    i.     Substantive Right ....................................... 24

                    ii.     Anti-Bullying Policy ................................... 25

                    iii.     Deliberately Indifferent ............................. 27

               c.     Equal Protection ................................................... 28

           2.     Title IX Claim ............................................................ 31

          3.     Qualified Immunity ..................................................... 36

IV.     MOTION TO EXCLUDE EXPERT TESTIMONY ................................ 36

V.     CONCLUSION ................................................................................. 36

This matter is before the Court on defendants' Motion to Exclude Opinions and Testimony of Plaintiff's Expert and to Strike Plaintiff's Expert Designation ("Motion to Exclude Expert Opinions") (Doc. 35), defendants' Motion for Summary Judgment (Doc. 36), and plaintiff's Motion for Leave to Amend Complaint (Doc. 53). Plaintiff timely resisted defendants' Motion to Exclude Expert Opinions (Doc. 43) and defendants filed a timely reply (Doc. 47). Plaintiff also timely resisted defendants' Motion for Summary Judgment (Doc. 40) and defendants timely filed a reply (Docs. 49 & 51). Defendants also filed a timely resistance to plaintiff's motion to amend (Doc. 54) and plaintiff timely filed a reply (Doc. 55). On December 30, 2020, the Court held a hearing on the Motion to Exclude Expert Opinions and the Motion for Summary Judgment and the parties presented oral arguments. (Doc. 56).

For the following reasons, plaintiff's Motion for Leave to Amend Complaint is **denied** (Doc. 53), defendants' Motion for Summary Judgment is **granted** (Doc. 36), and defendants' Motion to Exclude Expert Opinions is **denied as moot**.

## I.    BACKGROUND

This case involves a female elementary school student who was removed from her school and told she would be placed in an alternative school on disciplinary grounds during the 2018 academic year. The following facts are undisputed unless otherwise noted. The Court will discuss additional facts as they become necessary to its analysis.

### A.    Parties

At all relevant times, A.M. was a twelve-year old female enrolled as a sixth grade student at Barnum Elementary School ("Barnum") in the Manson Northwest Webster School District. (Doc. 40-1, at 1). Becky Gullion ("plaintiff") is A.M.'s mother. (*Id.*).

Manson Northwest Webster School District (the "District") is a school district located in Iowa that serves approximately 750 students in kindergarten through twelfth

grade. (*Id.*). Justin Daggett ("Daggett") is the District's superintendent. (*Id.*, at 2). Brett Larson ("Larson") is Barnum's principal. (*Id.*).

### B. Incidents Related to Bullying

In September and October of 2018, there were three reported incidents at Barnum involving bullying where A.M. was the victim. (Doc. 40-1, at 7). The three incidents culminated in A.M. writing a note titled "people I wanna kill list" (the "notebook list"). (*Id.*, at 14).

The first incident occurred on September 24, 2018, and involved several boys in A.M.'s class "being mean" to A.M. at recess. (Docs. 40-1, at 7; 49, at 7). The incident was reported to Pam Bleam ("Bleam"), the school counselor, but the parties dispute whether A.M. reported the incident herself or whether A.M.'s friends reported the incident on her behalf. (Docs. 40-1, at 7; 49, at 7). Bleam spoke with A.M. about the incident, wrote a note documenting the incident, and sent the note to Larson. (Doc. 49, at 9). Larson spoke with the boys accused of bullying A.M., but he does not recall if he spoke to A.M. about the incident. (Docs. 40-1, at 7–8; 49, at 11). Larson accidentally deleted Bleam's note from his phone, but he wrote his own note summarizing the incident, including that the incident was reported and that Bleam discussed it with A.M. (Doc. 49, at 9–10).

The second incident happened several days later. On October 1, 2018, A.M. and another female sixth grade student reported finding two notes in or near their lockers. (Doc. 40-1, at 9). The notes stated, "go lick your mom" and "go suck a dick," and were signed by "Mystery guy." (Docs. 36-2, at 37; 40-1, at 9; 49, at 14). At least the second note was addressed to A.M., if not both. (Docs. 36-2, at 37; 49, at 14). According to plaintiff, A.M. and the other student found the notes on September 26, 2018, and A.M. took the notes home and showed plaintiff. (Doc. 49, at 14–15). Plaintiff asserts she emailed Larson to inform him of the notes. (*Id.*). Plaintiff claims that A.M. then gave

4

the notes to the school nurse, who then passed them on to Larson. (*Id.*). Thus, there is no dispute that Larson was informed of the incident and that he documented that he had received the notes. (Docs. 40-1, at 9; 49, at 15). In response, Larson met with A.M. and the other female student to discuss the notes and to determine when the notes had been placed in the lockers. (Doc. 49, at 15). After the meeting, Larson reviewed security tapes of the area around A.M.'s locker to see if he could determine who had placed the notes in the lockers. (*Id.*, at 16). Larson did not see anybody place the notes in the lockers on the security tapes. (Docs. 40-1, at 9; 49, at 17). Larson did not interview plaintiff as part of his investigation, did not file a bullying complaint based on the notes, and did not enter the documentation into the district's SWIS bullying tracking program. (Doc. 49 at 19–20).

The third and final reported incident occurred at a school-sponsored football game on October 12, 2018. (Docs. 40-1, at 10; 49 at 22). It is unclear exactly what happened at the football game because A.M. had difficulty recalling the specifics of the incident during her deposition. (Doc. 39, at 6 n.1). At the very least, however, there is agreement that A.M. told teachers that several boys were mean to her and at least one boy had kicked her and thrown a bottle at her. (Doc. 49, at 23). After the football game ended one of the teachers, Jason Englert ("Englert") saw A.M. and another student near a dumpster. (Doc. 40-1, at 10). The other student told Englert that A.M. was trying to choke herself. (*Id.*). Englert stayed with A.M., asked her questions, and contacted two other educators, Kevin Wood and Kelli Girard, for assistance. (*Id.*, at 10–11). At least one educator remained with A.M. until they were able to contact plaintiff and plaintiff arrived to pick up A.M. (*Id.*, at 11–12).

The following Monday, October 15, 2018, Englert prepared an incident report based on his observations and sent the report to Larson and Bleam. (Doc. 49, at 23). The report included the names of the four boys A.M. accused of bullying her. (*Id.*, at

5

23–24). Larson "visit[ed]" with the students who were accused of bullying A.M. (*Id.*, at 25). Larson also met with A.M. (*Id.*). Larson did not, however, inform plaintiff of his investigation, did not create his own independent documentation of the event, and did not make a referral to the SWIS system. (*Id.*, at 25–27).

Several days later, on October 19, 2018, A.M. wrote a note in her personal notebook titled "people I wanna kill list." (*Id.*, at 28). The names of the four male students who had bullied and harassed A.M. at the football game were listed in the note. (*Id.*). A.M. did not intentionally show the notebook list to other students, but two students saw the list and informed their teacher, Michelle Ruhland ("Ruhland"). (Docs. 40-1, at 14; 49, at 28). Ruhland informed Larson of the list and retrieved the notebook from A.M.'s classroom. (Doc. 40-1, at 14). Larson then spoke with A.M. in his office. (*Id.*, at 14–15). Larson also spoke with both plaintiff and A.M. to discuss the situation, during which A.M. explained she did not want to kill the listed people but was writing down her feelings because her therapist suggested she do so. (*Id.*).

### C. Investigation, Disciplinary Meeting, and School Transfer

Larson informed plaintiff and A.M. that A.M. was suspended, although it is disputed when they were informed of the suspension. (*Id.*, at 16). Both parties agree, however, that neither Larson nor anybody else from the district ever sent plaintiff a written notice of the suspension. (Doc. 49, at 30). At some point, Larson consulted with Daggett and the Director of Legal Services for the School Administrators of Iowa, Matt Carver ("Carver"), about the appropriate disciplinary action. (Doc. 40-1, at 17). According to defendants, other students who had made threats of physical violence against other students had been sent to an alternative high school. Thus, Larson informed A.M. and plaintiff that A.M. would be placed at North Central Consortium School ("NCCS"). (Docs. 40-1, at 20; 49, at 31). Larson did not send a change of placement letter to plaintiff before the placement decision was made and plaintiff was not included

6

in defendants' conversation about the placement decision. (Doc. 49, at 33–34). It is disputed whether the placement at NCCS was part of A.M.'s suspension, or whether it replaced A.M.'s suspension. (Docs. 40-1, at 20; 49, at 31).

NCCS is a school separate and distinct from the District. (Doc. 49, at 32). NCCS serves students from 24 Iowa school districts and serves students who: 1) need to serve a short-term out-of-school suspension; 2) require a different educational placement based on infractions or behavior issues; or 3) have special education needs that cannot be met by home districts. (Doc. 40-1, at 21). Plaintiff refused to have A.M. attend NCCS and instead elected to have A.M. move in with her grandparents and attend school in a different district. (*Id.*, at 20).

### D.    *Claims and Procedural History*

On April 18, 2019, plaintiff filed a complaint as the parent and next friend of A.M., a minor, against defendants. (Doc. 1). Plaintiff's complaint contains two counts. First, plaintiff brought constitutional claims under Title 42, United States Code, Section 1983 for procedural due process, substantive due process, and equal protection violations. (*Id.*, at 8–9). Second, plaintiff brought a claim for violations of Title 20, United States Code, Section 1681, or Title IX. (*Id.*, at 9–12). Plaintiff sought injunctive relief against the District and judgment against Daggett and Larson for actual and compensatory damages, attorney fees, pre- and post-judgment interest, and costs of the action. (*Id.*, at 9–11).

In response, defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. 10). According to defendants, plaintiff's claims were essentially claims for relief under the Individuals with Disabilities Education Act ("IDEA") and thus, plaintiff was required to exhaust administrative remedies before bringing a claim in this Court. (Doc. 10-1, at 5). Defendants argued that plaintiff's claims should be dismissed under Rule 12(b)(1) because plaintiff did not exhaust

administrative remedies before filing her case here. (*Id.*, at 1). Second, defendants argued plaintiff's constitutional claims should be dismissed under Rule 12(b)(6) because plaintiff failed to state a plausible claim for relief under the facts alleged in the complaint. (*Id.*).

On August 1, 2019, the Court entered an order denying defendants' motion to dismiss. (Doc. 15). In its Order, the Court found that the language plaintiff used in her complaint was similar to language used in IDEA cases. (*Id.*, at 8). The Court concluded, however, that "the gravamen of plaintiff's claims has nothing to do with A.M.'s disability or A.M.'s rights under the IDEA," and that plaintiff's complaint had only even mentioned A.M.'s disability once. (*Id.*, at 6–7). Thus, the IDEA did not govern plaintiff's claim and plaintiff did not have to exhaust administrative remedies. (*Id.*, at 11). The Court also found plaintiff had stated a claim for which relief could be granted because plaintiff had sufficiently alleged that the new school was substantially inferior and that A.M. had sufficiently pled that she had not been given enough notice to satisfy the due process requirement. (*Id.*, at 11–13). Thus, the Court denied defendants' motion to dismiss. (*Id.*, at 14).

On August 12, 2019, plaintiff filed an amended complaint which corrected the spelling of her last name but did not contain any other changes. (Doc. 16, at 1).

## II.     *MOTION TO AMEND COMPLAINT*

### A.     *Applicable Law*

Federal Rule of Civil Procedure 15(a)(1) provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after serving it, or," in certain circumstances, 21 days after service of a responsive pleading or a motion to dismiss, whichever is earlier. Rule 15(a)(2) provides that, in all other circumstances, a party should only be permitted to amend its pleading if the other party consents or the court grants leave to do so, which should be given "when justice so requires." FED. R. CIV.

8

P. 15(a)(2). Courts view motions to amend filed before the deadline set out in the scheduling order with a "liberal policy favoring amendments." *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 395 (8th Cir. 2016) (citing *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1090 (N.D. Cal. 2007)); *see also Williams v. Tesco Servs., Inc.*, 719 F.3d 968, 976 (8th Cir. 2013) (describing the standard as "liberal"). The Rule 15(a)(2) standard is discretionary and courts should deny leave only when "'there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment.'" *Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) (quoting *Hammer v. City of Osage Beach*, 318 F.3d 832, 844 (8th Cir. 2003) (internal quotations omitted)). Importantly, "parties do not have an absolute right to amend their pleadings, even under this liberal standard." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008) (citing *United States ex rel. Lee v. Fairview Health Sys.*, 413 F.3d 748, 749 (8th Cir. 2005)); *see also Hammer*, 318 F.3d at 844 (holding that there is no right to amend pleadings).

"'If a party files for leave to amend outside of the court's scheduling order, [however,] the party must show cause to modify the schedule.'" *Sherman*, 532 F.3d at 716 (alterations in original) (quoting *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008)). "Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order, not the more liberal standard of Rule 15(a)." *Id.* (citing *Popoalii*, 512 F.3d at 497). In multiple cases, this Court has discussed the interplay between the liberal amendment provision of Rule 15 and the good cause requirement of Rule 16. *See, e.g., Afshar v. WMG, L.C.*, 310 F.R.D. 408, 408–12 (N.D. Iowa 2015); *Pick v. City of Remsen*, 298 F.R.D. 408, 410–12 (N.D. Iowa 2014); *French v. Cummins Filtration, Inc.*, No. C-11-3024-MWB,

9

2012 WL 2992096 (N.D. Iowa July 19, 2012). In short, the party moving to modify a scheduling order to amend a pleading bears the burden of showing "diligence in attempting to meet the order's requirement." *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006). Although a court may consider prejudice to the non-moving party, courts generally will not address prejudice when a moving party has failed to demonstrate diligence. *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001).

### B.    Discussion

On December 11, 2020, plaintiff filed a motion to amend her complaint. (Doc. 53). Plaintiff's proposed amended complaint contains several changes from the current complaint. (Doc. 53-1). Most significantly, plaintiff added a third count alleging violations of the Rehabilitation Act ("Section 504"). (*Id.*, at 12). The proposed amended complaint alleges that defendants violated the Rehabilitation Act in several ways, including failing to provide notice to plaintiff that the school was creating a 504 Plan for A.M., that defendants failed to follow appropriate placement procedures required for students with 504 Plans, and that defendants were deliberately indifferent to A.M.'s rights to be educated with other non-disabled students. (*Id.*, at 12–13). The proposed amended complaint also contains additional, or at least newly arranged, facts supporting their new claim. *See* (*Id.*, at 4; Doc. 16, at 4).

The parties generally agree on the applicable law for a motion to amend a complaint. Even though the parties cite to both Federal Rules of Civil Procedure 15 and 16, they also both recognize the interplay between the rules and acknowledge that there must be good cause for a motion to amend a complaint outside the scheduling order to be granted and that the primary measure of good cause is the movant's diligence in attempting to meet deadlines. (Docs. 54, at 2; 55, at 3).

The parties also appear to agree on the significant dates and deadlines that affect this matter. On August 14, 2019, the Court filed the initial Scheduling Order and

Discovery Plan. (Doc. 19). The Scheduling Order set October 14, 2019, as the deadline to amend pleadings. (*Id.*, at 1). The parties were ordered to complete discovery by April 17, 2020. (*Id.*, at 2). On March 27, 2020, the Court granted the parties' joint motion to extend the close of discovery to June 16, 2020. (Doc. 27). On May 19, 2020, after a status conference the Court again extended the discovery deadline to July 1, 2020. (Doc. 29). On June 17, 2020, the Court once again extended the discovery deadline to August 31, 2020. (Doc. 31).

On November 11, 2019, defendants gave plaintiff their first set of discovery documents, which included a version of the 504 Plan. (Doc. 54, at 3; 55, at 3). On May 19, 2020, the Court amended the Scheduling Order to accommodate discovery issues that had developed as a result of the COVID-19 pandemic. (Doc. 54, at 3). On July 14, 2020, plaintiff's counsel deposed some of the District's school personnel. At some point during the depositions, defendants provided plaintiff with a "different" 504 Plan. (Doc. 54, at 3; 55, at 3). "On October 16, 2020, [d]efendants filed a Motion for Summary Judgment on all of [p]laintiff's claims. The Motion was fully submitted as of November 20, 2020." (Doc. 54, at 4). Plaintiff did not file her motion to amend her complaint until December 11, 2020. (*Id.*).

The parties disagree on whether plaintiff has shown good cause to amend her complaint and whether she has been diligent in attempting to meet the scheduling order's requirements. According to plaintiff, she first saw the 504 Plan when defendants produced it as part of A.M.'s cumulative file on November 11, 2019, approximately a month after the Scheduling Order's amended deadline. (Doc. 53-2, at 2). Plaintiff also states the first time she had the opportunity to question defendants about the 504 Plan was during depositions on July 13 and 14, 2020, and that a different 504 Plan was given to her during the depositions. (Docs. 53-2, at 2; 55, at 3). Plaintiff also argues that even though she was provided the 504 Plans earlier, "[i]t was not until the Defendant asserted

in its Motion for Summary Judgment that it was made clear that the Defendants are relying on the creation of a 504 Plan." (Doc. 55, at 3).

Plaintiff was not diligent in trying to meet the Scheduling Order's requirements. Plaintiff asserts that she could not have known about the 504 Plan until she saw it in discovery documents produced in November 2019. The Court is skeptical that plaintiff first became aware of A.M.'s disability plan in November, particularly because the Court's August 1, 2019 order denying the motion to dismiss discussed, at length, issues involving A.M.'s status as a disabled student. (Doc. 15). Taking plaintiff's statements as true, however, plaintiff could not have complied with the October 14, 2019 deadline to amend pleadings because she did not know about the 504 Plan until November of that year. But after learning of the 504 Plan or at least being put on notice that such a plan existed—in November 2019 and then again in July 2020—plaintiff did nothing to try to amend her complaint. Indeed, plaintiff did not move to amend until several weeks after defendants' motion for summary judgment was filed and she had filed a response. Thus, she was not diligent in moving to amend her complaint, despite being put on notice of the issue at several different points.

Plaintiff's reasons for her delay are also unavailing. The Court acknowledges the difficulties the COVID-19 pandemic has caused for the litigants here and understands plaintiff's argument that the pandemic has made timely depositions and discovery challenging. Largely for these reasons the Court extended the discovery deadline three times. (Docs. 27, 29, & 31). The challenges plaintiff has faced, however, did not wholly prevent her from acting diligently. By plaintiff's own admission, she had notice of the 504 Plan in November 2019 (several months before the start of the pandemic), or, at the latest, by July 2020. There is nothing in the record that indicates she could not have diligently moved to amend her complaint immediately after either of those notices, or at least moved at that time for an extension of the deadline for doing so.

Plaintiff's argument that she was unaware of the significance of the 504 Plan until defendants cited it in their motion for summary judgment is also unconvincing. First, issues involving A.M.'s disability status arose in the early stages of litigation in this case, so plaintiff was aware it could be a factor in the resolution of this case. Second, summary judgment is intended to dispose of claims when there are no disputes as to any material facts. Summary judgment motions are not meant to alert the opposing party of a legal strategy or theory so the opposing party can revise their complaint and add claims so as to evade summary judgment. That plaintiff did not consider a legal claim until after she became aware of it through an opposing party's motion is not a reason to allow her to amend her complaint.

The Court also finds it is likely the amended complaint would prejudice defendants because it adds a new claim well after the close of discovery and as trial approaches.[1] When a court finds a movant was not diligent in seeking to amend a complaint, the court need not consider prejudice to the non-moving party and the Court declines to more fully consider the argument here. *Bradford*, 249 F.3d at 809.

The Court finds plaintiff was not diligent in amending her complaint and did not show good cause for her lack of diligence. Thus, plaintiff's motion to amend her complaint is **denied**.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Applicable Law

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in

---

[1] Trial is scheduled for March 22, 2021. (Doc. 32).

the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific

facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996). When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

### B.    Discussion

Defendants move for summary judgment on each of plaintiff's claims. The Court will first consider plaintiff's constitutional claims raised under Section 1983 before turning to plaintiff's Title IX claim.

### 1.    Section 1983 Claims

Plaintiff's complaint alleges several constitutional violations brought via Title 42, United States Code, Section 1983. Plaintiff first alleges A.M. was denied procedural due process when defendants issued A.M. a five-day suspension and stated they would place her at NCCS. (Doc. 16, at 8). Plaintiff then alleges defendants violated A.M.'s

substantive due process rights. Specifically, plaintiff asserts defendants were deliberately indifferent when they failed to provide notice of the anti-bullying policy and when they failed to take corrective measures against the bullying. (*Id.*). Last, plaintiff argues A.M. was denied equal protection because defendants were deliberately indifferent to the bullying and because defendants imposed harsher penalties on A.M. than on the male students. (*Id.*, at 7).

The Court will first consider plaintiff's procedural due process claims. The Court will then turn to plaintiff's substantive due process claims and equal protection claims.

### a. Procedural Due Process

The Court will first examine plaintiff's procedural due process claim as it relates to A.M.'s suspension and will then consider her procedural due process claim as it relates to A.M.'s placement at NCCS.

### i. Suspension

Defendants move for summary judgment on plaintiff's procedural due process claim as it relates to A.M.'s suspension from Barnum. (Doc. 39, at 11–13). Defendants argue that the level of process a school must give to a student before suspending the student for ten days or less requires only that the student "be given oral or written notice of the charges against h[er] and, if [s]he denies them, an explanation of the evidence the authorities have and an opportunity to present h[er] side of the story." (*Id.*, at 12) (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). Defendants further argue that A.M. was given the required level of process because Larson had a conversation with plaintiff and A.M. about the contents of the journal entry, allowed plaintiff and A.M. to speak and explain why A.M. wrote the list, and then notified plaintiff and A.M. of the suspension. (*Id.*, at 12–13).

Plaintiff resists, arguing defendants did not afford A.M. due process as it relates to her suspension. (Doc. 41-1, at 11–13). Plaintiff's argument questions whether A.M.

16

was actually suspended and when the suspension happened. (*Id.*). The gravamen of plaintiff's argument, however, is that the district did not follow its own policy of providing written notice of the suspension to plaintiff. (*Id.*, at 13). Plaintiff concedes that defendants correctly quote the legal standard set forth in *Goss v. Lopez*, 419 U.S. 565 (1975), but that it is irrelevant because defendants did not afford A.M. the process required by the District. (*Id.*).

The United States Supreme Court has addressed procedural due process requirements for students facing temporary suspensions. *Goss*, 419 U.S. at 577–84. In *Goss*, the Court "recognized '[a] 10-day suspension from school . . . may not be imposed in complete disregard of the Due Process Clause,' because a student's 'legitimate entitlement to a public education [is] a property interest protected thereby.'" *Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1123 (8th Cir. 2005) (quoting *Goss*, 419 U.S. at 574, 576). When the student's suspension is for ten days or less, however, due process requires only "that the student be given written notice of the charges against h[er] and, if [s]he denies them, an explanation of the evidence the authorities have and an opportunity to present h[er] side of the story." *Goss*, 419 U.S. at 565. The notice and the hearing may happen at the same time and generally should precede the student's removal from school, but there are "situations in which prior notice and hearing cannot be insisted upon" and "the necessary notice and rudimentary hearing should follow as soon as practicable." *Id.* at 582–83. Thus, a suspension for less than ten days conforms with procedural due process requirements when a student was given notice of the charges against her and an opportunity to present her side of the story. A school's noncompliance with its own suspension policy does not violate a student's procedural due process rights when the due process given conforms to the constitutionally required process. *See Schuler v. Univ. of Minn.*, 788 F.2d 510, 515 (8th Cir. 1986).

Here, A.M. was afforded the procedural due process required under the Fourteenth Amendment. There is no dispute that plaintiff was told A.M. would be suspended for five days. Specifically, plaintiff stated in her deposition that she was told A.M. would be suspended for five days on October 19, 2018. (Doc. 40-3, at 12). In her brief, plaintiff asserts she was not told A.M. would be suspended for five days until October 22, 2018. (*Id.*). The distinction is immaterial. The *Goss* Court made clear that it is preferable to give notice of a suspension before the student is suspended, but in certain situations the notice can come later. *Goss*, 419 U.S at 582–83. Here, A.M. was suspended on a Friday and plaintiff was told of A.M's suspension, at the latest, on the following Monday, which is reasonable under the circumstances. There is nothing in the record that shows A.M. or plaintiff did not receive notice of the suspension. The record is also clear that A.M. had an opportunity to be heard. Both A.M. and plaintiff testified that they were able to speak during the meeting. (Docs. 39, at 12; 42, at 93–94, 100). The conversation at the meeting included a brief discussion about why A.M. wrote the list. (*Id.*).

It is also not decisive that, assuming plaintiff's timeline of events is correct, defendants did not follow the school policy to provide notice of the suspension. *Schuler*, 788 F.2d at 515. The District should have followed its established policies in the interests of fairness and giving parents reasonable expectations of how situations will be handled. The only constitutional process that is required, however, is notice and an opportunity to be heard. *Id.*; *see also Goss*, 419 U.S. at 565. Both of those indisputably occurred here.

### ii. Placement

Defendants next move for summary judgment on plaintiff's procedural due process claim as it relates to A.M.'s placement at NCCS. (Doc. 39, at 13–18). Defendants argue there is no constitutional right for a parent and child to choose where the student is educated within the public school system and thus, due process concerns only arise when

a student is moved to a school where the education the student receives is substantially inferior to that of their prior school. (Doc. 39, at 13–14). Defendants further argue that there is no evidence that NCCS is substantially inferior to Barnum, A.M.'s first school. (*Id.*, at 13). In support of their argument, defendants assert expert testimony is necessary to show a school is substantially inferior, but plaintiff has not designated an expert to opine on the schools' qualities. (*Id.*, at 14–15). Defendants also argue there is no evidence in the record to support a claim that NCCS is substantially inferior to Barnum. (*Id.*, at 15–16).

Plaintiff disagrees and argue A.M.'s placement at NCCS violated her procedural due process rights. (Doc. 41-1, at 13–20). First, plaintiff argues that because A.M. was a student who had a Section 504 Plan, there were specific procedures that had to be followed before A.M. could be transferred to a new school. (*Id.*, at 15–18). For example, a school placement change for a Section 504 student requires, among other things, that a parent be involved in the decision-making and that the new school be involved in the placement analysis. (*Id.*, at 16–17). According to plaintiff, defendants did not follow any of these procedures for the placement decision. (*Id.*, at 17). Second, plaintiff also responds to defendants' argument that there is no expert witness and that the evidence does not support a finding that NCCS is substantially inferior. (*Id.*, at 18–20). Plaintiff states the correct standard for determining when process is due is "whether 'the education received at the alternative school is significantly different from or inferior to that received at [the student's] regular public school.'" (*Id.*, at 18) (quoting *Chyma v. Tama Cty. Sch. Bd.*, No. C07-0056, 2008 WL 4552942, at *3 (N.D. Iowa Oct. 8, 2008). Plaintiff asserts an expert is not necessary to answer this question and there is evidence in the record supporting a claim that NCCS is significantly different from Barnum. (*Id.*, at 18–19).

"Although a state 'may not be constitutionally obligated to establish and maintain a public school system,' once it has done so, 'the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause.'" *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 968 (8th Cir. 2015) (quoting *Goss*, 419 U.S. at 574). "The property interest which is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process." *Id.* (quoting *Goss*, 419 U.S. at 574); *see also Chyma*, 2008 WL 4552942, at *3. The entitlement to a public education, however, does not extend to guarantee the right for a parent or student to choose where the child will be educated within the public school system. *Id.* Instead, it guarantees a right to an education. "It appears to be the consensus of the circuits . . . that placement in an alternative school does not implicate procedural due process rights unless there is a showing that the education provided by the alternative school is substantially inferior." *Chyma*, 2008 WL 4552942, at *3.

Plaintiff argues several factors prove NCCS was an inferior school, including that NCCS does not track proficiency standards, that A.M. could not participate in band at NCCS, that there was no nurse at NCCS, and that NCCS's curriculum focuses on behavioral development and not academic education. (Doc. 40-3, at 18–19). None of these factors show, nor is there anything else in the record that shows, that NCCS was substantially inferior to Barnum Elementary.

First, the fact that NCCS does not track student progress or overall proficiency is not evidence that NCCS is inherently substantially inferior, even drawing reasonable inferences in favor of plaintiff. At best, the failure to track students could cause some other type of inferiority or deficiency. For example, a failure to track and report student proficiency could cause the school to fail to detect students that are failing or staff that are underperforming, thus resulting in an inferior educational environment. Here, there

20

is no additional evidence, however, that NCCS's lack of tracking resulted in such deficiencies. Thus, although the Court acknowledges that this tracking failure may theoretically cause a school to be inferior, there is no evidence here that it actually did so.

Next, even though A.M. would have been permitted to participate in after school activities at Barnum, she could not participate in the band program because it met during regularly scheduled class time when she was required to be at NCCS. It is undeniable that arts programs, including band, play an important role in a student's education. It is only one component of the education experience and the absence of one class does not necessarily mean the overall education is *substantially* inferior. Also, again, "[t]he property interest that is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process." *Goss*, 419 U.S. at 574.

Third, at oral argument, plaintiff indicated that NCCS does not have a school nurse. The absence of a nurse does not make a school substantially inferior. Plaintiff has not cited, and the Court is not aware of any cases that hold the absence of a nurse makes a school's education inferior. Like the Court discussed above about band class, there is no doubt that school nurses might play a significant role in a child's education and school experience. But it is only a component of the education and removing the nurse component does not deprive the student of the entire education process.

Last, a focus on behavioral education is not evidence that a student is receiving a substantially inferior education. There are many different focal points in education, one of which is behavioral. Focusing on that does not mean the education is any less important or inferior to other educations that focus on other areas. Also, the evidence in the record suggests the opposite of plaintiff's conclusion. Not only did the principal of NCCS testify that students still learned math and sciences, but also that the class sizes at

21

NCCS were smaller to give students more personalized learning. (Docs. 51, at 12; 36-2, at 89–90).

None of these factors, taken individually, provides evidence that NCCS was substantially inferior than Barnum. Nor does the cumulative effect of each of these factors show that NCCS was inferior. In other words, when taken together, the lack of student score tracking, the absence of a school band and school nurse, and a focus on behavioral education do not evidence that NCCS was substantially inferior or would have deprived A.M. of her educational experience. There is nothing in the record that shows these factors individually or cumulatively evidence a substantially inferior education.

There is a separate question, however, about whether A.M. was required to have additional due process protections because of her status as a student with a disability. Plaintiff makes two arguments that relate to A.M.'s status as a student with a disability. First, plaintiff argues that defendants denied A.M. due process when they created her 504 Plan without following the necessary requirements. (Doc. 41-1, at 15). Second, plaintiff argues that once a 504 Plan is developed for a student, that student is afforded additional due process protections before she can be moved to a new school. (*Id.*, at 15–18).

The Court finds plaintiff's first argument without merit here. The claim is necessarily one for a 504 Plan violation because it is dependent on how the 504 Plan was created. It does not venture into any claim beyond who was consulted and what notice was provided in creating the plan. Thus, it is a claim for the 504 Plan. The Court has already found above that plaintiff did not timely plead 504 Plan violations and has denied plaintiff's motion to amend her complaint to add 504 Plan violations.

Plaintiff's second argument is more complicated. It appears the crux of plaintiff's argument is not that A.M.'s Section 504 rights were violated (although plaintiff does seem to suggest as much), but rather that A.M.'s status as a Section 504 student places

22

her in a different category of persons that are afforded additional constitutional due process protections before they can be transferred to a different school. The distinction between these arguments is thin, but important.

The federal regulations contain requirements for placing a student with a disability in a school. The regulations require, "an evaluation . . . of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement . . . and any subsequent significant change in placement." 34 C.F.R. § 104.35(a). The regulations also provide that in making placement decisions, the school must draw upon information from a variety of sources, establish procedures to make sure all information is documented properly, and "ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child." *Id.* at § 104.35(c). Iowa law also provides rules for how a placement decision must be made. Under Iowa law, "[i]n determining the educational placement of a child with a disability . . . each public agency must ensure . . . . [t]he placement decision shall be made . . . [b]y a group of persons, including the parents[.]" Iowa Admin. Code r. 281-41.116(1)(a)(1).

There is a dispute about when plaintiff was given notice and whether she was part of the decision-making process. (Docs. 41-1, at 17–18; 51, at 3). It is immaterial, however, because these claims are based on her disability. These are rights given to her statutorily based on her status as a student with a disability. As such, they could state a claim for a violation of A.M.'s statutory rights. But as the Court found above, plaintiff did not plead as much and the Court denied plaintiff's motion to amend her complaint. Thus, plaintiff does not have a viable claim on these grounds.

Alternatively, though, plaintiff argues A.M. was denied due process under the Fourteenth Amendment because, as a student with a disability, she was afforded greater due process protections. Plaintiff does not cite any cases, nor is the Court aware of any,

23

that stand for the proposition that a disabled student is afforded greater due process protections before they are placed in a different school. All that is required is notice and an opportunity to be heard. Also, there is not a due process violation when a student is placed at a school that is not substantially inferior. The Court has already found above that NCCS is not substantially inferior.

### b. Substantive Due Process

Plaintiff's substantive due process claim appears to be divided into two main arguments. First, that defendants violated A.M.'s substantive rights by not following their own policy on bullying and by not providing plaintiff notice of the anti-bullying policy. (Doc. 41-1, at 20). Second, plaintiff argues that defendants did not take corrective measures related to the bullying and that defendants were deliberately indifferent to A.M.'s bullying. (Docs. 16, at 7; 41-1, at 21). The Court will consider each alleged violation in turn, but it will first discuss defendants' more general argument that there is no substantive due process violation here.

### i. Substantive Right

According to defendants, plaintiff's substantive due process claim must fail because defendants did not have a constitutional duty to protect A.M. from being harassed because the harmful activity was between two private parties. (Doc. 39, at 19–21). In other words, A.M. did not have a substantive right to be protected from bullying by the school.

Defendants correctly state that "[e]xcept in certain limited circumstances, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'" *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993) (quoting *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 (1989)). There are two established exceptions to the general rule. First, a state has a duty to protect an individual against private violence "when the state takes

24

a person into its custody and holds him there against his will." *Id.* (quoting *DeShaney*, 489 U.S. at 199–200. Second, "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in." *Id.* at 733 (quoting *Wells v. Walker*, 852 F.2d 368, 370 (8th Cir. 1988)). Courts have not extended these exceptions to the public school setting. *See id.* at 732; *Bosley v. Kearney R-1 Sch. Dist.*, 904 F. Supp. 1006, 1018–19 (W.D. Mo. 1995), *aff'd*, 140 F.3d 776 (8th Cir. 1998) (finding a student was not in the custody of a school district nor did the school district place her in a dangerous position and, thus, the school district was not liable for harm committed by other students).

Here, there is nothing in the record to support a finding that either of these exceptions applies. A.M. was not taken into custody and held against her will. As a minor, she was required to attend school, which removes a certain level of autonomy and freedom. Going to school, however, is not the same as being held against her will like in the cases contemplated by the exceptions, such as in a prison or mental institution. Similarly, there is no evidence that defendants affirmatively placed A.M. in a position of danger she would otherwise not have been in. Failing to prevent bullying is not the same as affirmatively placing someone in danger. Thus, neither of the exceptions applies here. Because the school district did not have a constitutional duty to protect A.M. from harassment from her classmates, her substantive due process claim fails.

Although the Court finds plaintiff did not have a substantive due process claim based on the school district's duty to protect, the Court will briefly consider plaintiff's alternative substantive due process arguments next.

### ii. Anti-Bullying Policy

Plaintiff asserts that defendants "were deliberately indifferent to the due process rights of A.M. and her parent by failing to provide any notice concerning the anti-bullying policy." (Doc. 16, at 7). In her brief resisting summary judgment, plaintiff also asserts

that defendants violated A.M.'s due process rights when they failed to follow their own anti-bullying policies. (Doc. 41-1, at 20). In short, plaintiff argues that defendants' anti-bullying policies created a substantive right, and "[w]hen the [d]efendants did not follow their own policy it [was] a violation of [p]laintiff's substantive due process rights." (*Id.*).

Before the Court can consider whether defendants violated A.M.'s due process rights, it must first determine whether a substantive right existed. According to plaintiff, the existence of the school's anti-bullying policy created a substantive right in all students attending the school, including A.M. here. (*Id.*). In support of her position, plaintiff cites *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999). The facts in *Davis* are not unlike the facts at issue here. In *Davis*, a female elementary school student was harassed, often sexually, by a male classmate. 526 U.S. at 633. The harassment was brought to the attention of school staff and administrators, but the harassment continued for months. *Id.* Plaintiff brought a claim against the school for monetary and injunctive relief under Title IX. *Id.* at 632–33. The question before the *Davis* Court was "whether a private damages action may lie against the school board in cases of student-on-student harassment." *Id.* at 633. The Court concluded that private damages may lay against the school board, "but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Id.*

The Court here does not read *Davis* to create a substantive right in all students attending defendants' school. Nor does *Davis* stand for the proposition that when the defendants did not follow their own policy it amounts to a violation of due process rights. Although the *Davis* opinion does discuss the deliberate indifference standard, it does so in the context of a right existing under Title IX, not as a substantive due process right. Indeed, the opinion does not even discuss substantive due process. Although the *Davis* decision contains helpful analysis relating to Title IX and the deliberate indifference standard, the Court does not agree that it stands for plaintiff's proposition. Plaintiff does

26

not cite, and the Court is unaware, of any other cases supporting her position. To the contrary, binding Eighth Circuit precedent states that failure to follow internal policies does not support a substantive due process claim. *Schuler* 788 F.2d at 516.

Having found that a failure to follow internal policies, on its own, does not support a substantive due process claim, plaintiff does not present any evidence that she did not have notice of the anti-bullying policies. The evidence in the record supports a contrary finding that the policies were readily available for anybody to view on the district's website, which serves as notice to plaintiff of the policies. Thus, there was no substantive due process violation for a failure to provide notice or to adhere to district policies.

### iii. *Deliberately Indifferent*

Plaintiff's complaint alleges that defendants "were deliberately indifferent to the due process rights of A.M. and her parent by failing to take corrective measures relating to the known bullying." (Doc. 16, at 7). In her brief resisting summary judgment, plaintiff further states that for a substantive due process claim, she must show the school had knowledge of the bullying, the school acted with deliberate indifference to the bullying, and the bullying was so severe that it deprived A.M. of access to educational benefits and opportunities. (Doc. 41-1, at 21). Plaintiff's argument, in other words, is that A.M.'s substantive due process rights were violated when defendants were deliberately indifferent to the bullying and harassment.

The deliberately indifferent standard applies in cases with similar fact patterns involving bullying and harassment at school, and the Court finds it should apply here as well. Deliberate indifference, however, is more commonly applied to claims raised under Title IX. Indeed, plaintiff discusses deliberate indifference for her Title IX claim and incorporates nearly identical arguments there. Thus, the Court finds it is more appropriate to address the deliberate indifference argument below in analyzing plaintiff's Title IX claims. Plaintiff does not argue or cite to anything indicating the deliberate

indifference standard is different for Title IX claims versus constitutional substantive due process claims. The arguments below thus apply equally to the substantive due process claim and are fully incorporated here. In short, however, the Court finds defendants did not act with deliberate indifference and plaintiff's substantive due process claim fails on this argument as well.

### c.    *Equal Protection*

Defendants also seek summary judgment on plaintiff's final Section 1983 claim, namely that A.M. was denied equal protection. (Doc. 39, at 21–24). Defendants argue there is no evidence that A.M. was discriminated against based on her sex, nor is there any evidence in the record of students who are similarly situated to A.M. but treated more leniently. (*Id.*, at 21). Plaintiff generally does not disagree with the equal protection standard articulated by defendants but asserts that there is ample evidence in the record that shows defendants treated the male students who bullied A.M. more leniently than they treated A.M. (Doc. 41-1, at 22–24). According to plaintiff, that evidence establishes a prima facia equal protection violation.

Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Because the Equal Protection Clause requires the government to treat similarly situated people alike, dissimilar treatment of dissimilarly situated persons does not violate equal protection." *Mummelthie v. City of Mason City*, 873 F. Supp. 1293, 1333–34 (N.D. Iowa 1995) (citations omitted). To state an Equal Protection claim, a plaintiff must show that: "(1) [s]he is otherwise similarly situated to members of the unprotected class; (2) [s]he was treated differently from members of the

unprotected class; and (3) the defendant acted with discriminatory intent." *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000).

"The first step in an equal protection case is determining whether the plaintiff has demonstrated that he or she was treated differently than others who were similarly situated to him or her." *DePugh v. Smith*, 880 F. Supp. 651, 664 (N.D. Iowa 1995). "The similarly situated inquiry focuses on whether the plaintiff is similarly situated to another person or group for purposes of the challenged government action." *Id.* Plaintiff appears to argue A.M was similarly situated to other persons in three possible ways. First, plaintiff asserts A.M. was treated differently than the boys who allegedly bullied her. (Doc. 41-1, at 23). Second, plaintiff alleges A.M. was treated differently than other students by being sent to another school. (*Id.*). Last, plaintiff argues A.M.'s notebook list incident was investigated more thoroughly than the incidents wherein she was allegedly bullied. (*Id.*, at 24).

None of the groups or individuals that plaintiff identifies are similarly situated to A.M. First, the boys who allegedly bullied A.M. are not similarly situated in the sense that one group is the aggressor, and the other is the victim. The accused aggressors necessarily take on a different role than the victim. Indeed, one would expect them to be treated differently, and punished more severely, based on their role as the bullies here. That they were not investigated or reprimanded as thoroughly as plaintiff argues they should have been, however, does not amount to an equal protection violation. To be similarly situated, plaintiff would have to show that either A.M. had left notes in lockers and bullied the boys and was treated differently, or that the boys were also bullying victims whose claims were taken more seriously than A.M.'s. Plaintiff has shown neither of those things here.

The second possible group, i.e. other students from the District who had written lists about wanting to kill other students, is likely similarly situated. According to

29

defendants, there were two other incidents similar to A.M.'s notebook list. (Doc. 39, at 23). In the two previous incidents, one of the students making the threats was male and the other female. According to defendants, both students were also placed at NCCS. (*Id.*). Thus, in the cases when there were accurate comparators who were similarly situated, the similarly situated individuals were treated the same as A.M.

Last, plaintiff states that defendants "actions with respect to when a female is bullied and harassed is diametrically different than when the Defendants were confronted with the list of names written by A.M." (Doc. 41-1, at 24). The Court understands plaintiff's argument to be that when A.M. was the aggressor, defendants treated her more harshly than they did the boys when the boys were the aggressors. In one sense, A.M. and the boys were similarly situated because they were both the aggressors. Even so, their behaviors were far from similar. The boys called A.M. names, allegedly wrote her inappropriate notes, and possibly kicked her and threw a bottle at her on one occasion. Bullying is a serious problem and a school should never ignore this type of behavior or condone it as typical boyish behavior. A.M., on the other hand, wrote a list of people she wanted to kill and named them. It is true that A.M. did not act on her wish list and, considering the evidence in the light most favorable to plaintiff, would not have. Perhaps, in that sense, A.M.'s conduct was relatively benign and could be dismissed as a childish mistake. But in today's climate of endless school violence and shootings, a potential threat of serious bodily harm against other students necessarily needs to be addressed swiftly and decisively. Here, the nature of the conduct and potential consequences of the conduct were not so similar as to place the boys and A.M. in a similarly situated position.

Thus, plaintiff has failed to identify groups or individuals to which she was similarly situated whom defendants treated differently based on sex.

The second step in analyzing an equal protection claim in the context of gender-based discrimination is whether "the unequal treatment was the result of intentional or

30

purposeful discrimination." *Doe v. Fairfax Cty. Sch.*, 403 F. Supp. 3d 508, 515 (E.D. Va. 2019); *see also Greer*, 212 F.3d at 370. The Court, however, has already found that plaintiff has not identified similarly situated students who were treated differently than A.M. Thus, the Court need not consider the second question. *See Mummelthie*, 873 F. Supp. at 1333 ("Absent a threshold showing that she is similarly situated to those who allegedly received favorable treatment, the plaintiff does not have a viable equal protection claim."); *see also Daniels v. Lutz*, 407 F. Supp. 2d 1038, 1047 (E.D. Ark. 2005) ("Summary judgment on an equal protection claim is appropriate when a plaintiff fails to offer specific evidence of incidents in which they were treated differently than others who were similarly situated.").

For these reasons, the Court grants summary judgment in favor of defendants on plaintiff's equal protection claim.

### 2. *Title IX Claim*

As noted above, plaintiff's Title IX claim is premised on her argument that defendants were deliberately indifferent in responding to A.M.'s complaints and known bullying incidents.

Title 20, United States Code, Section 1681(a) ("Title IX") states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" Congress enacted Title IX to combat "discrimination on the basis of sex in any educational program that receives federal funding." *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014). "Individuals whose Title IX rights have been violated have a private right of action." *Id.* (citing *Cannon v. Univ. of Chic.*, 441 U.S. 677, 717 (1979)). To be successful on a Title IX claim, a plaintiff must prove: (1) that defendant is a Title IX recipient; (2) the school knows of harassment in its programs or activities; (3) the school was deliberately

31

indifferent to the harassment and the harasser is under its programs or activities; and (4) the "harassment . . . is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an education opportunity or benefits provided by the school." *Davis*, 526 U.S. at 629; *see also K.T. v. Culver-Stockton Coll.,* 865 F.3d 1054, 1057 (8th Cir. 2017).

"[A] recipient intentionally violates Title IX, and is subject to a private damages action, where the recipient is deliberately indifferent to known acts of [harassment]." *Davis*, 526 U.S. at 643. This includes harassment between students. *Id.* The deliberate indifference standard requires that the school's indifference caused the student to be subjected to harassment. *K.T.*, 865 F.3d at 1057. "[D]eliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse." *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001). As the Sixth Circuit Court of Appeals explained:

> The recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. The deliberate indifference standard does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. The standard does not mean that recipients must expel every student accused of misconduct. Victims do not have a right to particular remedial demands. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.

*Vance v. Spencer Cty. Pub. Sch. Dist.* 231 F.3d 253, 260 (6th Cir. 2000). It is not enough, however, that a school merely responded at all. *Doe v. Rutherford Cty., Tenn., Bd. of Educ.*, No. 3:13-cv-00328, 2014 WL 4080163, at *13 (M.D. Tenn. Aug. 18, 2014). Rather, it must take reasonable action. *Id.*

Courts analyzing whether a district was deliberately indifferent consider whether the response was "clearly unreasonable in light of the known circumstances." *Davis*,

526 U.S. at 648. Factors other courts consider in determining whether something was clearly unreasonable include the time it took the district to respond to complaints, the level of response, the effort expended to respond to the allegations, and the efficacy of the response. *See, e.g.*, *Rutherford Cty.*, 2014 WL 4080163, at *13 (finding the district was deliberately indifferent when the district "dragged their feet for months in response to potentially serious allegations"); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 670 (2d Cir. 2012) (affirming jury's finding that the school was deliberately indifferent when the district delayed a response to allegations for a year or more and then gave only a "half-hearted" response). The deliberate indifference standard is often a fact question, but "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgement . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649. Thus, the Court can determine a district was not deliberately indifferent if the record supports that finding.

Here, there is no dispute that defendants had knowledge of the harassment and it is clear from the record that defendants knew of the three bullying incidents at issue here. The question then is whether defendants were deliberately indifferent to the known bullying. The Court finds the evidence in the record supports a finding that defendants were not deliberately indifferent to A.M.'s repeated complaints of harassment.

As a starting point, the Court finds nothing in the record to support a finding that defendants' indifference caused the harassment or made students vulnerable to such abuse. *Culver Stockton Coll.*, 865 F.3d at 1057; *see also Shrum*, 249 F.3d at 782. There is nothing in the record that shows that defendants' leniency or failure to punish the bullies led to more bullying. Nor is there any evidence in the record that defendants' actions deterred the bullies from committing additional or more severe acts. In other words, the record does not contain evidence, even when taken together and given all reasonable inferences, that defendants' actions had either an aggravating or mitigating

33

effect on the boys' behaviors. To prove indifference, there must be evidence that the indifference caused the harassment or made students vulnerable to such abuse, but no such evidence exists here.

Second, the evidence supports a finding that defendants' responses were not clearly unreasonable. The record suggests that defendants may have violated reporting and record-keeping norms when investigating each complaint. The record also suggests in hindsight that defendants could have done a more thorough job of investigating each complaint and including plaintiff in each step of each response. On the other hand, the record shows that defendants, and Larson in particular, promptly responded to each incident. For example, after A.M. and another girl found vulgar notes by their lockers, Larson spoke with A.M. to try to determine who wrote the notes. When A.M. was unable to provide information, Larson reviewed security camera footage covering the area around her locker and the time frame it was likely someone would have left the notes. Also, after A.M. was harassed at the football game, school employees waited with A.M. until they knew she was safe. Larson then spoke with A.M. the following Monday to discuss the incident and discussed the incident with at least one of the accused boys as well. Regarding the first incident that involved boys making comments to A.M. at recess, Larson spoke with the boys and reprimanded them.

There is also nothing in the record that suggests defendants' response to the incidents was half-hearted. For instance, plaintiff appears to argue that Larson's effort to investigate the incident involving notes in the locker was half-hearted because he only reviewed portions of the security footage for "about an hour." (Doc. 41-1, at 23). Plaintiff does not provide any evidence about what portions of the security footage Larson neglected to view nor any evidence on why he should have viewed specific additional portions, or why an hour reviewing a video was insufficient. Instead, the record indicates that Larson spoke with A.M. about when she found the notes and then watched the

security footage for the time it was most likely the notes would have been placed by the locker. Plaintiff also appears to argue Larson half-heartedly investigated the incidents and addressed the situation because he did not keep clear records. True, principals and administrators should keep clear records of every incident that arises, but poor record keeping does not equate to a half-hearted effort to address a situation and nothing in the record supports such a conclusion.

Last, the incidents here took place over a relatively short time period. Less than a month passed between the first bullying incident on September 24, 2018, and when A.M.'s notebook list was discovered on October 19, 2018. There were three total bullying incidents reported during this time. This gave defendants relatively few opportunities to respond to the incidents and adjust based on the responses' efficacy. Had the harassment continued for longer and defendants' response continued to prove to be inadequate, the Court could more easily conclude there was a triable issue of whether defendants were deliberately indifferent. Here, however, there was hardly enough time for defendants to determine whether their response was working, or whether a more aggressive approach was needed.

Make no mistake, the Court finds the boys' comments and behavior clearly inappropriate and vile and believes there is no place for that type of behavior in our schools or elsewhere. But the deliberate indifference standard creates a high bar to clear and instructs the Court not to second-guess the disciplinary decisions that school administrators make. *See Vance*, 231 F.3d at 260. Under these circumstances, the Court cannot find that defendants were deliberately indifferent. Thus, the Court need not consider whether the harassment was so severe as to deprive A.M. of educational opportunities.

For these reasons, defendants' motion for summary judgment on plaintiff's Title IX claim is granted.

### 3. *Qualified Immunity*

Defendants argue that Daggett and Larson are entitled to qualified immunity. The Court has already found there was not a violation here, and thus, there is no viable claim from which Daggett and Larson can be immune. Thus, the Court need not discuss qualified immunity further.

## IV. *MOTION TO EXCLUDE EXPERT TESTIMONY*

This matter is also before the Court on defendants' Motion to Exclude Expert Opinion. (Doc. 35). This matter is fully briefed, and the Court heard oral arguments on it at the same time it heard arguments on defendants' motion for summary judgment. Because the Court has already found that summary judgment should be granted in favor of defendants on each count, there are no remaining claims and thus, the Court may not consider the motion to exclude expert testimony here. *See HSK, LLC v. United States Olympic Comm.*, 248 F. Supp. 3d 938, 943 (D. Minn. 2017) ("Under Article III of the United States Constitution, the jurisdiction of federal courts extends only to actual cases and controversies.") (citing U.S. CONST. art. III, § 2, cl. 1).

Thus, the motion to exclude expert testimony is **denied as moot**.

## V. *CONCLUSION*

For these reasons, defendants' Motion to Exclude Opinions and Testimony and to Strike Plaintiff's Expert Designation (Doc. 35) is **denied as moot**, defendants' Motion for Summary Judgment (Doc. 36) is **granted**, and plaintiff's motion to amend its complaint (Doc. 53) is **denied**. Judgment is entered in favor of defendants.

**IT IS SO ORDERED** this 27th day of January, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa